IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
LEWIS T. BABCOCK, CHIEF JUDGE

Civil Case No.  05-cv-01199-LTB

DONALD SUNDGREN,

       Plaintiff,

v.

JO ANNE B. BARNHART, Commissioner of Social Security,

       Defendant.

_____

ORDER
_____

      Plaintiff, Donald Sundgren, appeals from the Social Security Administration ("SSA")

Commissioner's final decision denying his application for disability insurance benefits, filed

pursuant to 42 U.S.C. §§ 401-433.  Jurisdiction is proper under 42 U.S.C. § 405(g).  Oral

argument would not materially assist me in the determination of this appeal.  After consideration

of the parties' briefs, as well as the administrative record, I REVERSE the SSA Commissioner's

final order and REMAND for further proceedings consistent with this opinion.

## I.  STATEMENT OF THE CASE

      Plaintiff seeks judicial review of the Commissioner's decision denying his application for

disability insurance benefits protectively filed on or about March 31, 2001.  [Administrative

Record ("AR") 29, 71]  The application was initially denied on June 13, 2002.  [AR 48]   Upon

Plaintiff's request, an Administrative Law Judge ("ALJ") conducted an evidentiary hearing on

August 12, 2003.  [AR 565]  The ALJ subsequently issued a written ruling on September 25,

2003, denying Plaintiff's application on the basis that he retained the residual functional capacity

to perform a range of sedentary to light work, with limitations, and thus he was not precluded

from performing his past relevant work as laundromat manager/operator (Step Four).  [AR 42]

On May 7, 2005, the SSA Appeals Council denied Plaintiff's administrative request for review of

the ALJ's determination, making the SSA Commissioner's denial final for the purpose of judicial

review.  [AR 8]  *See* 20 C.F.R. § 404.981.  Plaintiff timely filed his complaint with this court on

June 29, 2005, in which he seeks review of the Commissioner's decision.

## II. FACTS

Plaintiff was born in April 1952, and was 49 years old when his insured status expired in

March 2002, and 51 years old at the time of his hearing.  [AR 71, 79, 570]   He has a high school

equivalent education.  [AR 95, 570]   His past relevant work history includes working as a

stocker, sales representative, and laundromat manager/operator.  [AR 90, 102, 571-95]   Plaintiff

alleges that he became disabled on January 8, 1997, when he stopped working, due to reflex

sympathetic dystrophy ("RSD"); problems with balance; pain with increased movement; atrial

fibrillation; seizures due to hypoglycemia; impaired motor skills; a double laminectomy; and

sensitivity to cold and heat.  [AR 89, 571]

The medical records indicate that Plaintiff sustained a back injury in 1985, necessitating at

least one lumbar laminectomy.  Plaintiff recovered and returned to substantial gainful activity.

[AR 311]

In April 1996, Plaintiff's right foot was crushed in a work accident, which developed into

significant pain.  In November 1996, Plaintiff saw Dr. Richard Charles, a podiatrist, who

performed foot surgery – an excision at the second and third web space – on January 8, 1997.

2

[AR 311]   From March through April 1997, Plaintiff received a series of nerve blocks to his foot

and lumbar spine from Dr. Charles and Dr. Paul Leo.  [AR 171, 215, 224, 226, 231, 296]  The

blocks resulted in temporary pain relief.  [AR 212, 224, 231, 296]  Also during this time, Plaintiff

received physical therapy for treatment of edema, joint mobilization and scar manipulation, which

he was unable to tolerate due to pain.  [AR 297-300]  Dr. Charles subsequently excised a

neuroma in Plaintiff's foot during a second surgery on April 29, 1997. [AR 171, 175, 201, 305,

308]

     After Plaintiff's pain remained unresolved, he was referred to Dr. Peter Quintero, who

performed a neurological evaluation and additional testing in June 1997.  [AR 272]  Dr. Quintero

reported functional problems as:  "standing, bending, exertion, and lifting makes leg pain worse.

Lying in certain positions at night will also cause worsening of the pain [and] low back pain with

radiation to the right."  [AR 281]  An MRI, bone scan, and nerve conduction study came back

positive for edema, demineralization, and abnormal signal.  [AR. 273-279]  Although not

confirmed by the testing, Dr. Quintero determined that the examination findings were suggestive

of a reflex sympathetic dystrophy (RSD) diagnosis involving the right lower extremity.  [AR 272]

RSD, which is also known as complex regional pain syndrome, is a "disturbance of the

sympathetic nervous system marked by pallor or rubor, pain, sweating, edema, or skin atrophy

following sprain, fracture or injury to nerves or blood vessels;" it is described as "enigmatic, in ...

its treatment" with "pain out of proportion to initiating trauma."  *Ricketts v. Apfel,* 16 F.Supp.2d

1280, 1289 n. 4 (D.Colo. 1998); *see also* SSR 03-2p.

     In July 1997, Dr. Charles indicated that Plaintiff had reached maximum medical

improvement from a surgical standpoint, and was released to return to work, but Plaintiff still

experienced general problems related to his RSD diagnosis.  [AR 285, 289]  In August 1997,  Dr. Julie W. Colliton, a physical medicine and rehabilitation specialist, began treating Plaintiff's RSD. [AR 284, 357, 457]  Dr. Colliton's initial evaluation was that his symptoms, the objective findings, and the diagnostic studies were consistent with "a sympathetically maintained pain phenomenon in his right lower extremity."  [AR 459]

In September 1997, Dr. Colliton referred Plaintiff to Dr. Floyd Ring for evaluation to a pain management program.  [AR 311, 455]  After examining Plaintiff, Dr. Ring felt that further testing was necessary to confirm an RSD diagnosis before implementing a treatment program. He opined that Plaintiff had "chronic pain, lower right extremity," but he did not find "sympathetically maintained pain" or RSD.  [AR 316]  Dr. Ring inferred a non-organic component to his overall pain complaints.  [AR 455]  In follow-up testing, a thermographic study revealed abnormal quantitative and qualitative hypothermia of the right posterior leg and plantar foot, but showed no thermographic findings of a complex regional pain syndrome/RSD.  [AR 335-36]  On October 14, 1997, Dr. Robert Wright, a pain specialist, examined Plaintiff's foot under anesthesia, and found a "some magnified illness behavior in terms of hypersensitivity, [but] there seems to be a very legitimate pain generator at the base of the second metatarsal phalangeal joint area."  [AR 453]   After administering a lumbar sympathetic block, Dr. Wright opined that the "positive response to [the block] suggests that [Plaintiff's] syndrome is more related to a complex regional pain syndrome as opposed to focal peripheral neuralgia." [AR 451]

In December 1997, Plaintiff saw an orthopedic specialist, Dr. Mark Conklin, who diagnosed him with RSD (in addition with his previous diagnosis, made in October of 1996, of right foot second and third toe MTP joint synovitis of the right foot) and recommended physical

therapy with an emphasis on desensitization techniques. [AR 461-62]

On January 26, 1998, an functional baseline test was performed for Dr. Colliton.  [AR 339]  It recommended that Plaintiff could return to work in that he had lifting capabilities of up to 40 pounds and had carrying capabilities of 15 pounds for 100 feet with difficulty.  [AR 339-40]  The test indicated that Plaintiff could walk for 10 minutes, he could not bear weight to squat, he could do a half static squat, but no climbing ladders secondary to his seizures. [AR 340]  The report also noted that Plaintiff limped and used a cane, could not toe/heel walk, and his right foot was swollen, purple, and cooler than the left.  [AR 340, 342]

On February 10, 1998, Dr. Colliton determined that Plaintiff could return to work, with several physical restrictions, and indicated that he was ready for an impairment rating.  [AR 446]  On March 24, 1998, Dr. Colliton found Plaintiff's right foot pain was "essentially without change," and that he had reached maximum medical improvement; she concluded that his complex regional pain syndrome/RSD resulted in a 15% whole person impairment rating. [AR 442]  She opined that Plaintiff could work with restrictions of occasional lifting of 40 pounds and carrying of 15 pounds for 100 feet, and a "nonmaterial handling" kind of walking for 10 minutes. [AR 442, 446]  Pain, loss of range of motion, and difficulty with walking were the reasons provided for these restrictions.  [AR 442]  On April 14, 1998, Dr. Colliton further indicated that Plaintiff could return to work on a part-time basis, increasing gradually to full time over the course of six weeks. [AR 441]

In August 1998, Dr. Donald Harder, an orthopedist, performed an independent medical evaluation and impairment rating.  [AR 356]  Plaintiff complained of pain and RSD symptoms in his right foot.  Based on his examination, Dr. Harder diagnosed Plaintiff with crush injury of the

5

right foot with RSD, and assessed him an impairment rating of 11% whole person.  [AR 358]  He determined that with maintenance care, Plaintiff could perform sedentary work that didn't require prolonged walking.  He further opined that Plaintiff could walk for short distances only, carry 15-20 pounds, and climb stairs with a rail.  Plaintiff was unable to squat, kneel, crawl or walk at a rapid pace. [AR 359]

On January 29, 1999, Plaintiff was referred for a vocational evaluation.  [AR 363]  After performing various vocational/occupational assessment tests, the report concluded that given Plaintiff's limited education and actual academic skills; inability to return to past relevant work; physical restrictions; psychological problems and cognitive problems; high level of easily aggravated pain; and inability to perform activities on a regular and sustained basis, he was no longer able to work or earn any wages.  [AR 370]

In January 2000, Dr. Colliton reported that a follow up exam revealed no change since the fall of 1999.  [AR 439]  After a series of injections/blocks were again deemed unsuccessful, Plaintiff was again released to work by Dr. Colliton in February 2000 to a modified/sedentary position.  [AR 438]  Plaintiff remained off work, however, as he was either unable to work or his employer was unable to accommodate his needs. [AR 435]  In May 2000, Dr. Colliton again opined that Plaintiff was "not entirely unemployable [and] I think that he could get back to some sedentary capacity."  [AR 435]

On April 12, 2000, Plaintiff underwent an independent medical evaluation by Dr. Sander Orent, an occupational medicine specialist.  [AR 372]  Plaintiff complained of intense burning pain in his lower extremity, low back pain and inability to walk more than ½ block.   After his examination, Dr. Orent concluded that Plaintiff did not have a sympathetically mediated pain

disorder, based on the lack of objective physical findings, but instead exhibited a subjective complaint of "extreme sensitivity to light touch." [AR 379]  Dr. Orent opined that Plaintiff's symptoms were psychogenic in origin and that he may be magnifying his symptoms with primary or secondary gain issues. [AR 379]  Dr. Orent concluded that Plaintiff was capable of performing sedentary to light work, which did not require prolonged walking and allowed him to change positions during the day.  Dr. Orent noted that Plaintiff emphysema and seizure disorder might impose other limitations.  [AR 380]

On December 12, 2000, Dr. Colliton again found that Plaintiff's right lower extremity condition was essentially unchanged on examination.  [AR 434]  In August 2001, after Dr. Colliton moved from the area, Plaintiff began seeing Dr. J. Scott  Bainbridge for pain management. [AR 430, 527]   Dr. Bainbridge assessed Plaintiff with complex regional pain syndrome "of the right foot and leg status post crush injury and neuroma removal." [AR 431]

In September 2001, Plaintiff underwent a consultive examination by Dr. Ruth Staritt.  [AR 468]  Plaintiff complained of RSD of the lower right extremity, irregular heart rhythms, memory loss and pain in both hips and legs.  He reported a three year history of emphysema and a long history of seizure activity.  After reviewing Plaintiff's various ailments, Dr. Staritt concluded that Plaintiff's primary medical concern was his RSD.  She opined that Plaintiff "can sit, stand for brief periods of time, move about slowly while using a cane, ... lift, carry and handle objects.  He could hear, speak and travel.  He will not be able to walk for long distances.  He will not be able to climb or crawl on his knees.  He will not be able to squat frequently." [AR 473]   She concluded that he "can work and do related activities" and that "he should be able to do sedentary work." [AR 473]

Plaintiff underwent a second consultive examination by Dr. Michael Finch in April 2002. [AR 478] Plaintiff complained of RSD, balance problems, atrial fibrillation, diabetes, seizures, impaired motor skills on the right, and residual pain from back surgery. [AR 478] After examination and testing, Dr. Finch diagnosed Plaintiff with chronic pain syndrome of the right lower extremity and back, and opined that Plaintiff could lift up to 30 pounds, but should only carry 20 pounds for a short distance. He also limited Plaintiff to occasional stair climbing with a rail, stooping, and crouching. Dr. Finch determined that Plaintiff could sit, stand or walk for 4 to 6 hours in an 8-hour day, with frequent position changes, but he should avoid repetitive kneeling or crawling. [AR 481]

On May 13, 2002, the SSA's non-examining physician, Dr. W.H. Keener, reviewed Plaintiff's medical records and concluded, in a physical residual functional capacity evaluation, that Plaintiff was capable of: occasionally lifting 10 pounds and frequently lifting 10 pounds; standing and/or walking with normal breaks about 6 hours in an 8-hour workday; occasional pushing/pulling with right lower extremity, consistent with a light RFC. [AR 149] Plaintiff was further restricted to avoid working around hazardous machinery or unprotected heights due to his seizure disorder. [AR 153]

On December 6, 2002, Plaintiff had an independent medical evaluation related to a motor vehicle accident that occurred in June of 2002. [AR 501] Plaintiff reported neck and low back pain, numbness in the left leg, left shoulder and hand pain, and headaches in relation to the accident. Dr. Allison Fall noted a long history of complex regional pain syndrome, deemed stable, involving the right foot and leg. [AR 502] Dr. Fall opined that Plaintiff was "not capable of working [as] he was disabled even prior to the automobile accident." [AR 506]

8

On January 27, 2003, Plaintiff returned to see Dr. Bainbridge with complaints of neck, lower back and bilateral leg pain related to the motor vehicle accident.  [AR 493]  In a follow-up on March 28, 2003, Plaintiff reported increased left lower extremity pain and, on June 6, 2003, he reported severe pain in his hands, which Dr. Bainbridge diagnosed as possible rheumatoid arthritis, as well as continued left lower extremity pain.  [AR 489-90]

In July 2003, Dr.  David A. Wong conducted an orthopedic evaluation on Plaintiff for complaints of left leg and back pain related to the motor vehicle accident.  [AR 485]  Dr. Wong's assessment only related to Plaintiff's injuries sustained in the accident – specifically back and *left* leg pain; Dr. Wong did not assess or even discuss pain related to Plaintiff's right side.  [AR 485]

On December 4, 2003, Dr. Bainbridge opined that Plaintiff "is not capable of gainful employment."  [AR 527]  Dr. Bainbridge also completed an RSD residual functional capacity questionnaire in which he opined that Plaintiff could:  frequently lift less than 10 pounds and occasionally lift 20 pounds; sit 30 minutes at a time for about 4 hours in an 8-hour workday; stand 20 minutes at a time; and stand/walk for about 2 hours in an 8-hour workday.  He also needed to walk every 30 minutes in order to relieve pain.  [AR 528]  In addition, in a letter dated January 9, 2004, Dr. Bainbridge indicated that Plaintiff was having increased problems with his hands, and had increased lower back and continued symptoms related to his right lower extremity RSD.  [AR 535-36]

Finally, Plaintiff also presented the following evidence related to his mental impairments. First, Plaintiff was examined by Dr. Lawrence Haburchak, a clinical psychologist, on September 9, 1997.  [AR 376, 605]  Dr. Haburchak reported that Plaintiff had "significantly higher" levels of depression, scored moderate depression on the Beck's Depression Inventory, and had

"psychological characteristics" that exacerbate his pain. [AR 607]  Dr. Haburchak found that Plaintiff was experiencing significant levels of depression and anxiety related to his pain and reduced abilities, and noted that Plaintiff's tendency toward negative and defeatist attitudes that might undermine his treatment. [AR 377, 607]

On August 13, 1998, Dr. Randolph W. Pock, a psychiatrist, found that Plaintiff had significant depression on the Beck's Depression Inventory. [AR 610]  Dr. Pock assessed a  "mild to moderate" range of permanent mental impairment, attributed "entirely to his injury and its effects," with an exact impairment rating of 15%. [AR 614]

## II. LAW

A five-step sequential evaluation process is used to determine whether a claimant is disabled, which is generally defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505; *see also Bowen v. Yuckert*, 482 U.S. 137, 137, 107 S.Ct.  2287, 96 L.Ed.2d 119 (1987); *Campbell v. Bowen*, 822 F.2d 1518, 1521 (10th Cir.1987).

Step One is whether the claimant is presently engaged in substantial gainful activity.  If he is, disability benefits are denied. *See* 20 C.F.R. § 404.1520.  Step Two is a determination whether the claimant has a medically severe impairment or combination of impairments as governed by 20 C.F.R. § 404.1520(c).  If the claimant is unable to show that his medical impairments would have more than a minimal effect on his ability to do basic work activities, he is not eligible for disability benefits.  Step Three determines whether the impairment is equivalent to one of a number of listed

10

impairments deemed to be so severe as to preclude substantial gainful employment.  *See* 20 C.F.R. § 404.1520(d).  If the impairment is not listed, he is not presumed to be conclusively disabled.  Step Four then requires the claimant to show that his impairment(s) and assessed residual functional capacity ("RFC") prevents him from performing work that he has performed in the past.  If the claimant is able to perform his previous work, the claimant is not disabled.  *See* 20 C.F.R. § 404.1520(e) & (f).

Finally, if the claimant establishes a *prima facie* case of disability based on the four steps discussed, the analysis proceeds to Step Five where the Secretary has the burden of proving that the claimant has the RFC to perform other work in the national economy in view of his age, education and work experience.  20 C.F.R. § 404.1520(g).

## IV.  RULING

The ALJ concluded that Plaintiff was not disabled.  [AR 25]  The ALJ first determined that Plaintiff had not engaged in any substantial gainful activity during the relevant period under review (Step One).  [AR 42]  The ALJ next found that Plaintiff had the following severe impairments:  status/post lumbar laminectomy and a right foot crush injury; reflex sympathetic dystrophy (RSD) involving the right lower extremity; lumbar disc disease; chronic obstructive pulmonary disease; a seizure disorder; a history of cardiac disease; and a "recent diagnosis of rheumatoid arthritis vs. osteoarthritis" (Step Two).  [AR 42]   However, because Plaintiff's had no impairment or combination of impairment of such severity as to medically meet or equal any condition deemed to be so severe as to preclude substantial gainful employment (Step Three), the ALJ went on to determine whether Plaintiff retained the RFC to perform the requirements of his past relevant work.  [AR 22]

11

The ALJ found that Plaintiff retained the RFC for a range of light to sedentary work in that he could:

> perform work activity requiring lifting 20 pounds occasionally and 10 pounds frequently, pushing or pulling up to 20 pounds, standing for 30 minutes at a time (2 hours a day with regular breaks), walking for 15 minutes at a time (2 hours per day with regular breaks) and sitting for 2 hours at a time (at least 6 hours per day with position changes at 30 minute intervals and regular breaks).  [AR 42]

In addition, the ALJ found that Plaintiff's RFC was limited as follows:

> The claimant requires a cane and should avoid using foot controls with the right lower extremity.  He is limited to no more than occasional climbing ramps or stairs (with a rail), balancing, stooping, kneeling, crouching or crawling.  He should avoid climbing ropes, ladders or scaffolding, and work environments where he would be exposed to extremely cold temperatures and fumes or odors.   He should not work at heights, around moving machinery, on rocky or uneven terrain or in work situations where driving is a major component of the job duties. [AR 42]

The ALJ next determined that Plaintiff's past work as a "laundromat manager/operator (DOT 369.167-010)" do not require the performance of work-related activities precluded by his RFC limitations (Step Four).   [AR 42]   Because Plaintiff's impairments do not prevent him from performing his past relevant work as a laundromat operator/manager, as the job is generally performed throughout the national economy, the ALJ found that Plaintiff was not disabled under the standards of the Social Security Act.  [AR 43]

On appeal of the ALJ's decision, the SSA Appeals Council found no reason to review the ALJ's decision and, thus, denied Plaintiff's request for review, making the ALJ's decision final. [AR 8]   This appeal followed.

## V. STANDARD OF REVIEW

The function of my review is limited to determining whether the correct legal standards were applied, and to evaluating whether the factual findings are supported by substantial evidence

in the record as a whole. *Howard v. Barnhart*, 379 F.3d 945, 947 (10th Cir. 2004). "Substantial

evidence is more than a scintilla, but less than a preponderance; it is such evidence that a

reasonable mind might accept to support the conclusion." *Campbell v. Bowen*, *supra*, 822 F.2d at

1521 (*citing Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)).

I examine the record as a whole, including whatever in the record fairly detracts from the weight

of the Secretary's decision and, on that basis, determine if the substantiality of the evidence test

has been met. *Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir.

1991)(*citing Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456

(1951)). I may not re-weigh the evidence or substitute my judgment for that of the ALJ. *See

Casias v. Secretary of Health & Human Servs., supra*, 933 F.2d at 800; *Jozefowicz v. Heckler*,

811 F.2d 1352, 1357 (10th Cir. 1987); *Cagle v. Califano*, 638 F.2d 219, 220 (10th Cir. 1981).

## VI. ANALYSIS

To determine whether a claimant can perform his past relevant work at Step Four, as is

relevant here, the ALJ is required to address the three phases articulated in *Winfrey v. Chater,* 92

F.3d 1017 (10th Cir. 1996). The first phase requires an evaluation of the claimant's RFC. *Id.* at

1023. The second phase entails an examination of the demands of the claimant's past relevant

work. *Id.* In the third phase, "the ALJ determines whether the claimant has the ability to meet

the job demands found in phase two despite the mental and/or physical limitations found in phase

one." *Id.*

The claimant bears the burden of proving that his medical impairments prevent him from

performing work that he has performed in the past; however, in order to make the ultimate finding

that a claimant is not disabled at Step Four, the ALJ is required to make specific and detailed

predicate findings concerning the claimant's residual functional capacity, the physical and mental

demands of the claimant's past jobs, and how these demands mesh with the claimant's particular

exertional and nonexertional limitations.  *See* SSR 96-8p; SSR 82-62; *see also Winfrey v. Chater,*

*supra*, 92 F.3d at 1023-25.

**A.  Phase One:   Plaintiff's RFC - Physical Limitations**

Plaintiff first argues that the ALJ erred when determining his RFC at the first phase of

Step Four because the ALJ did not adequately evaluate his physical limitations.  Specifically, he

contends that the ALJ's finding that he can do sedentary work with 6 hours of sitting and 2 hours

of standing and walking is not supported by substantial evidence, and the ALJ's finding that he

can lift 10 pounds frequently and 20 pounds occasionally is not supported by any evidence in the

record.

A plaintiff's RFC represents the capacity of a claimant to perform work, despite physical

and/or mental impairments.  RFC is defined as "the most you can still do despite your limitations."

20 C.F.R. § 404.1545(a).  The SSA assesses RFC based on all the relevant evidence in the case

record.  *Id.*  The parties do not dispute that Plaintiff's insured status expired on March 31, 2002,

and that he must have been disabled prior to that date in order to receive benefits pursuant to 20

C.F.R. §§ 404.101- 404.133.  [AR 29-30, 79]

The ALJ found that the record did not support Plaintiff's claim that "his pain is of such

severity as to preclude the performance of all work activity."  [AR 39]  In support of this finding,

the ALJ noted that both the examining and treating sources indicated that Plaintiff was capable of gainful employment at the sedentary level, despite his impairments.  Dr. Colliton determined that Plaintiff could return to work activity, with some accommodations and at a gradual pace, in March 1998.  After Plaintiff was unsuccessful, she still insisted  that he "could do some other type of sedentary work" in May 2002.   Subsequently, both Dr. Staritt and Finch found that Plaintiff could perform sedentary work which did not require prolonged walking or standing.

The ALJ also noted that Drs. Ring and Orent suggested that Plaintiff had a non-organic component to his pain complaints, and Plaintiff's own subjective complaints were disproportionate to the examination findings.  [AR 39-40]

As a result, the ALJ's specific finding that Plaintiff can do sedentary work, with 6 hours of sitting and 2 hours of standing and walking, is adequately supported by substantial evidence.  The range of opinions as to Plaintiff's functional limitations before March of 2002 is significant, but none are directly contradictory to the ALJ's conclusion.  For example, after ordering a "functional baseline test," Dr. Colliton opined in February of 1998, that Plaintiff was capable of "non-material handling" walking for ten minutes.  In August of 1998, Dr. Harder's opinion was that Plaintiff could not perform prolonged walking and he was limited to short distances.  In April 2000, Dr. Orent also opined that Plaintiff's RSD symptoms limited him to no prolonged walking.  In April of 2001, Dr. Staritt was of the opinion that Plaintiff could not walk for long distances, and could stand for brief periods at a time.  Finally, in April 2002, Dr. Finch indicated that Plaintiff could stand or walk 4 to 6 hours a day, with frequent position changes. These examining physicians agreed that Plaintiff could, at a minimum, perform sedentary work which 20 C.F.R. § 404.1567(a) defines as a jobs where "walking and standing are required occasionally."  The ALJ rejected the

15

contradictory conclusion of a vocational evaluation – conducted by two rehabilitation counselors, Mark E. Litvin, Ph.D. and Helen M. Woodard, M.A., in January of 1999 – that Plaintiff was no longer able to perform any type of work activity as inconsistent with the treating and examining sources of record.  [AR 39]  The ALJ also rejected Dr. Hall's December 2002 opinion, related to her examination of Plaintiff's injuries from a car accident which occurred after his insured status had expired,  that Plaintiff had been disabled for seven years prior to the accident.  [AR 37]  The ALJ noted, among other things, that Dr. Fall's opinion appeared to be based on Plaintiff's reporting, as her examination findings were minimal and did not address Plaintiff's RSD.  [AR 37]  As a result, when viewed as a whole, I conclude that this evidence in the record is sufficient to supports the ALJ's determination that Plaintiff was capable of sedentary work with 6 hours of sitting and 2 hours of standing and walking.

As to the ALJ's finding that Plaintiff can lift 10 pounds frequently and 20 pounds occasionally, the record reveals that Plaintiff's initial functional baseline test for Dr. Colliton in January of 1998 indicated that he was capable of occasionally lifting 40 pounds, and carrying 15 pounds for 100 feet.  Dr. Harder opined, in August 1998, that Plaintiff could carry 15-20 pounds. Dr. Staritt did not opine as to Plaintiff's carrying capabilities, but she did note that he could lift, carry and handle objects in September 2001.  Dr.  Finch opined in April 2002 that Plaintiff could lift 30 pounds, but that he could only carry 20 pounds for a short distance.   As a result, I disagree with Plaintiff's assertion that the ALJ's finding that he can lift 10 pounds frequently and 20 pounds occasionally is not supported by any evidence.  Although the evidence is certainly contradictory, as is often the case with chronic pain and RSD symptoms,  I conclude that it is sufficient to support the ALJ's RFC findings.

16

**B.  First Phase:   Plaintiff's RFC - Mental Limitations**

Plaintiff also argues that the ALJ erred when determining that Plaintiff "failed to sustain his burden of proving that he has a medically determinable mental impairment."  As result, Plaintiff likewise maintains that because the ALJ's hypothetical did not include any mental limitations, the vocational expert's testimony does not support the finding that Plaintiff can work.

The ALJ found that Plaintiff did not present evidence that he had a medically determinable mental impairment.  Plaintiff testified to a "poor mental state," including his inability to concentrate, short-term memory problems, and irritability, and the record contains references to minor depression and sleep problems.  [AR 591-93]  The ALJ found that Plaintiff was diagnosed with a possible anxiety disorder in 1994, and that he suffered a "bout of depression" in early 1999 following the death of his step-daughter, but then noted that Plaintiff failed to seek any related treatment.  He also noted a recent diagnosis for depression, but properly disregarded it because it was over a year past the expiration of Plaintiff's insured status.  As a result, based on the absence of any clinical or diagnostic findings to establish a mental impairment, the ALJ concluded that Plaintiff "has failed to sustain his burden of proving that he has a medically determinable mental impairment."  [AR 31]

Plaintiff does not directly challenge this conclusion, but contends that the ALJ erred when he failed to assess Plaintiff's mental abilities in the context of determining  his RFC as is required by 20 C.F.R. § 404.1545(c) and SSR 96-8p.   He asserts that although the ALJ found that he had no severe mental impairment at Step Two of the sequential process, Plaintiff contends that such finding does not preclude the consideration of his mental limitations in his RFC at Step Four.

17

While that may be the case, the record here reveals that the ALJ found, with record support, that Plaintiff failed to prove that he has ANY medically determinable mental impairment.  As such, the ALJ did not reach the question of severity.  [AR 31]  Plaintiff's argument that the ALJ improperly "used the step two determination of non-severity to avoid assessing Plaintiff's mental functional limitations" relative to his RFC is therefore misplaced.

Furthermore, I disagree with Plaintiff that the record contains substantial evidence that his functional capacity is effected by mental impairments in his ability to:  remember, concentrate, get along with coworkers and accept supervision.  The ALJ specifically found, and I agree, that Plaintiff's "complaints or poor concentration and memory are not borne out in the medical records[,] nor his account of his daily activities and[,] thus, have no bearing on his residual functional capacity."  [AR 41]   Plaintiff references only minimal notations in the medical records where it is mentioned that Plaintiff reports depression and/or sleeping problems, and the related treatment with anti-depressants. [AR 406, 408, 437]   As noted by the ALJ, the records show that Plaintiff would discontinue taking anti-depressant medications of his own accord and refused to seek psychotherapy when it was suggested that he do so.  [AR 406, 408]  Finally, the additional evidence provided to me from Dr. Pock, as well as Dr. Haburchak's report that was apparently considered by the ALJ, does not alter that determination.  [AR 60]  These isolated reports, without any related treatment, do not reveal a medically determinable mental impairment that would effect Plaintiff's ability to work.  *See Coleman v. Chater,* 58 F.3d 577, 580 (10th Cir.1995).

As to Plaintiff's related argument that the hypothetical questions propounded to the vocational expert (VE) failed to accurately set forth all his  physical and mental limitations, I note

18

that the record reveals that the relevant hypothetical posed to the VE was consistent with the

RFC assessment made by the ALJ.  [AR 598]  The limitations Plaintiff maintains were not

considered were properly excluded because they were not part of the RFC assessment found by

the ALJ.  *See Qualls v. Apfel,* 206 F.3d 1368, 1373 (10th Cir. 2000)(finding no error when the

ALJ relied upon a hypothetical question to the VA that included all the limitations the ALJ

ultimately included in his RFC assessment); *Gay v. Sullivan*, 986 F.2d 1336, 1341 (10th Cir.

1993)(when the findings regarding a claimant's impairments are adequately reflected in the ALJ's

hypothetical inquiries to the VE, the expert's testimony constitutes substantial evidence to

support the ALJ's related determination).

## C.  First Phase: Plaintiff's Credibility

I also address and reject Plaintiff's assertion that the ALJ's findings discounting his

credibility were not supported by substantial evidence in that the ALJ misconstrued the applicable

evidence.

Subjective accounts of the severity of the pain must be evaluated with due consideration

of credibility, motivation, and medical evidence of impairment.  *Luna v. Bowen,* 834 F.2d 161,

165-66 (10th Cir.1987).  Other factors the court considers in evaluating whether pain is disabling

are attempts to find relief from pain, willingness to try treatment, regular contact with a doctor,

and daily activities.  *Id.*   "Credibility determinations are peculiarly the province of the finder of

fact, and we will not upset such determinations when supported by substantial evidence." *Kepler*

*v. Chater,* 68 F.3d 387, 391 (10th Cir.1995).  However, the ALJ's findings with respect to a

claimant's credibility "should be closely and affirmatively linked to substantial evidence and not

just a conclusion in the guise of findings." *Kepler v. Chater,* 68 F.3d 387, 391 (10th Cir. 1995).

Finally, the ALJ determines the weight and credibility of testimony, and these determinations are

generally considered binding on the reviewing court. *Broadbent v. Harris,* 698 F.2d 407, 413

(10th Cir.1983).

The ALJ found that the Plaintiff's "allegations and testimony are not fully credible to the

extent he alleged total disability and a total inability to work." [AR 42]  The ALJ based his

determination on evidence in the medical record that contradicted Plaintiff's claims related to the

extent of his pain; the evidence of record which showed that his "condition was responsive to

treatment and medication management;" and the fact that his account of his daily activities

"suggests a much higher level of functioning than he alleges." [AR 40]

As is usual with subjective claims of pain and related functional limitations, the evidence is

susceptible to more than one interpretation.  However, it is the province of the ALJ, as the fact

finder, to weigh the conflicting evidence.  *See Diaz v. Secretary of Health & Human Servs.,* 898

F.2d 774, 777 (10th Cir. 1990)(credibility determinations are for the finder of fact and should not

be disturbed when supported by substantial evidence).  Here, the ALJ's order, when viewed as a

whole, sufficiently addresses the extensive conflicting evidence, including the evidence that he

rejected or chose not to rely on, and the related reasons for his credibility determinations.  The

ALJ's order sufficiently demonstrates that he properly weighed the evidence when determining

that Plaintiff's testimony regarding his functional limitations was not credible.  *See Quails v.*

*Apfel, supra,* 206 F.3d at 1372 (upholding the ALJ's credibility determination because the ruling

stated the "specific evidence he relied on in determining that [the] plaintiff's allegations of

disabling pain were not credible").

**D.  Second Phase: Past Relevant Work**

Plaintiff next asserts that there was insufficient evidence for the ALJ to conclude that he could perform his past relevant work as a laundromat operator/manager.   Specifically, he argues that there was no substantial evidence that he could perform the job duties of a "laundromat manager," as the job is customarily or generally performed in the national economy pursuant to DOT 369.167-010.  After reviewing the record, I agree.

To prove that he cannot return to his past relevant work, claimant must show that he can perform neither "[t]he actual functional demands and job duties of a particular past relevant job," nor "[t]he functional demands and job duties of the occupation as generally required by employers throughout the national economy." SSR 82-61; *see also Andrade v. Secretary of Health & Human Servs.,* 985 F.2d 1045, 1050 (10th Cir.1993).

I first note that it is clear that the ALJ implicitly concluded that Plaintiff was unable to perform his  past work at the laundromat as it was actually performed.  The ALJ acknowledged in his order that Plaintiff's testimony was that he "performed this job in the light to occasionally medium range of exertion," and my review of the record reveals no evidence to the contrary.  [AR 41, 596]   Because Plaintiff's RFC, as found by the ALJ, could only accommodate work in the sedentary to light range, I conclude that Plaintiff demonstrated that he could not perform the actual functional demands and job duties of his particular past relevant job as a laundromat manager/operator.

However, the ALJ specifically found here that work as a laundromat manager is considered sedentary and skilled, as generally performed, pursuant to DOT 369.167-010.  [AR

21

599]  The ALJ determined that Plaintiff could perform this work with his RFC restrictions, as it is

customarily performed in the national economy, based on the VE's testimony about the job.  [AR

41]  Because he concluded that Plaintiff was capable of performing his past relevant work as

generally performed, the ALJ concluded that he was not disabled at Step Four of the sequential

process.  [AR 41]

 The position of "laundromat manager" as set forth in DOT 369.167-010 is sedentary and,

as such, Plaintiff is capable of performing the required exertional requirements as the job is

customarily performed.  [AR 598]  However, the  position is also considered a skilled job that has

a specific vocational preparation (SVP) of 6, with a level 4 reasoning and level 5 language and

math.  [AR 596]  *See* DOT 369.167-010.   At the hearing, when asked what kind of skills were

developed by Plaintiff from his job as a laundromat manager, the VE testified that the skills

developed would be limited to "basic maintenance and repair of coin operated machines."  [AR

601]  The ALJ than asked as if those skills would transfer to jobs in the semi-skilled range and

SVP 3 or 4 level jobs, to which the VE responded in the negative.  [AR 601]

 As a result, on this record the evidence is insufficient to support the ALJ's determination

that Plaintiff could perform the job of laundromat operator/manager as "neither the ALJ nor [the]

VE investigated the skills actually acquired by Plaintiff" or the applicability to the job description

at issue.  *Chavez v. Barnhart,* 298 F.Supp.2d 1207, 1220 (D. Kan. 2004)(*citing Dikeman v.

Halter*, 245 F.3d 1182, 1185 (10th Cir.2001)("[n]either an occupational title by itself nor a

skeleton description [of a job] is sufficient to document the claimant's acquisition of skills ")).

 Therefore, I conclude that there is insufficient evidence in the record to support the ALJ's

conclusion that Plaintiff duties from his past work at the laundromat would enable him to perform the job of a laundromat manager, as customarily performed in the national economy. On remand, the ALJ is instructed to:  make more specific findings regarding the duties and skills involved in Plaintiff's past work; develop a detailed record on the skills required of a laundromat manager/operator as that job is normally performed in the national economy; and, based on those findings, the ALJ should evaluate whether Plaintiff can perform that type of work. *See Chavez v. Barnhart, supra*, 298 F.Supp.2d at 1221.

Accordingly,  IT IS ORDERED that the Commissioner's decision is REVERSED and REMANDED  further proceedings consistent with this opinion.

Dated: May __2__, 2006 in Denver, Colorado.

BY THE COURT:

__s/Lewis T. Babcock_____
LEWIS T. BABCOCK, CHIEF JUDGE